UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Luke A. Williams, III, | ) | Civil Action No. 3:05-1648-CMC |
| | ) | |
| Petitioner, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | |
| | ) | |
| Jon Ozmint, Commissioner, | ) | |
| South Carolina Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is an inmate of the South Carolina Department of Corrections under two sentences of death. He filed a federal habeas petition pursuant to 28 U.S.C. § 2254 on July 13, 2005. For the reasons stated below, the court finds Respondent is entitled to summary judgment on Grounds I, II, and IV of the Petition. As to Ground III, however, Respondent's motion for summary judgment is denied and the Petition is granted. Although Petitioner is not entitled to an order vacating his convictions, his death sentences are hereby vacated without prejudice to the right of the State of South Carolina to sentence Petitioner to life imprisonment, or to conduct further proceedings as may be appropriate under state law (including a new sentencing hearing), if initiated within 270 days of the entry date of this order.

**PROCEDURAL POSTURE**

On November 21, 1993, Luke A. Williams, III (Petitioner) was convicted of the murders of his wife, Linda A. Williams, and his son, Shaun M. Williams.[1] The jury unanimously recommended two death sentences, which the trial judge imposed. Petitioner timely appealed to the South Carolina

---

[1]There is some discrepancy in the record as to the correct spelling of Shaun Williams' name. On the indictment the victim is listed as "Shaun M. Williams," yet he is referred to throughout the transcript of the trial as "Shawn" Williams. This court will use the spelling found on the indictment.

Supreme Court which, on March 18, 1996, affirmed his convictions and sentences. *State v. Williams* ("*Williams I*"), 468 S.E.2d 626 (S.C. 1996). Petitioner then filed a petition for writ of certiorari with the United States Supreme Court which was denied. *Williams v. South Carolina*, 519 U.S. 891 (1996).

On March 31, 1997, Petitioner filed a timely application for state post-conviction relief (PCR). This first PCR application was subsequently amended. On January 15, 1997, the first PCR court entered an order denying the amended application for PCR and dismissing it in its entirety. Petitioner filed a petition for writ of certiorari with the South Carolina Supreme Court, which was denied October 19, 2001.[2]

On January 24, 2002, Petitioner filed a second PCR application in the state circuit court. Respondent filed a motion to dismiss the application as successive. By order dated April 15, 2002, the second PCR court allowed Petitioner to proceed with a limited second PCR application. Petitioner filed an amended second PCR application dated July 15, 2002, to which Respondent filed a return. On November 11, 2002, the second PCR court held an evidentiary hearing on Petitioner's amended second PCR application. On August 29, 2003, the second PCR court entered an order granting Petitioner a new sentencing hearing, finding Petitioner's trial counsel had been ineffective in failing to request a "plain and ordinary meaning" jury charge during the penalty phase of Petitioner's trial and that such failure had been prejudicial. Respondent filed a petition for a writ of

---

[2]On November 9, 2001, Petitioner came to this court, seeking a stay of execution and appointment of counsel in anticipation of filing a petition in this court pursuant to 28 U.S.C. § 2254. The court granted both requests. *See* Order filed Nov. 14, 2001, *Williams v. Maynard*, D.S.C. Misc. No. 7:01-mc-214-CMC-GCK. On August 26, 2002, after a hearing and before any federal habeas petition had been filed, this court dissolved the stay because of a pending second PCR application. This court ordered that any subsequent federal habeas petition would not be considered successive based upon the earlier filing of the November 9, 2001 application for stay.

certiorari with the South Carolina Supreme Court. That court granted certiorari and, without oral argument, reversed the second PCR court's finding of prejudice. *Williams v. State* ("*Williams II*"), 611 S.E.2d 232 (S.C. 2005). Petitioner filed a motion for rehearing which was denied April 20, 2005.

Thereafter, Petitioner again[3] moved this court for appointment of counsel and a stay of execution in anticipation of filing a petition under § 2254. This court entered an order granting these requests on May 4, 2005. Petitioner filed his petition for writ of habeas corpus under § 2254 on July 13, 2005. Respondent filed a Return and Motion for Summary Judgment on August 31, 2005. Petitioner timely responded to the motion for summary judgment on October 31, 2005. Oral argument was heard by this court on March 24, 2006. This matter is now ripe for resolution.[4]

Petitioner asserts four grounds for habeas relief. In his first ground, Petitioner contends his conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Petitioner alleges that the evidence was constitutionally insufficient to support findings either that he killed his wife and son or that they were killed in South Carolina. This ground was presented to the South Carolina Supreme Court in the course of Petitioner's direct appeal. Therefore, this ground is exhausted and properly raised in this § 2254 petition.

As a second ground, Petitioner maintains his trial counsel was ineffective under the Sixth

---

[3]See note 2, *supra*.

[4]Cases filed under 28 U.S.C. § 2254 are normally referred to a United States Magistrate Judge for a Report and Recommendation pursuant to the Local Civil Rules of this court. However, pursuant to Local Civil Rule 73.02(D), this court elected to consider this matter without reference to a Magistrate Judge. Although the parties agree that this matter is not controlled by the time constraints contained in 28 U.S.C. §§ 2263 and 2266, this court finds that death penalty cases warrant expedited consideration by the court.

3

Amendment in failing to present available evidence. Petitioner contends that material evidence relating to the preparation of certain insurance forms entered into evidence during the guilt phase of his trial would demonstrate Petitioner's lack of guilty knowledge of the location of the homicides. This ground was presented in Petitioner's first PCR application. It has, therefore, been exhausted and is properly before this court.

In his third ground, Petitioner contends he was denied effective assistance of counsel under the Sixth Amendment due to trial counsel's failure to request a "plain and ordinary meaning" jury instruction during the penalty phase of his trial. This ground was presented in Petitioner's second PCR application, and it was upon this ground that the second PCR court vacated the death sentences. However, as noted above, the South Carolina Supreme Court reversed the second PCR court, finding Petitioner was not prejudiced by counsel's failure to request this charge. The ground is, therefore, exhausted and properly before this court.

In his final ground, Petitioner asserts his death sentences are incompatible with the Eighth Amendment's requirement of heightened reliability in capital cases. Petitioner contends the sentences are based on unreliable circumstantial evidence which does not exclude all reasonable hypotheses other than Petitioner's guilt. This ground was raised in Petitioner's direct appeal; therefore, it is exhausted and properly before this court.

### 28 U.S.C. § 2254

This court's review of this Petition is controlled by the current version of 28 U.S.C. § 2254, which was substantially rewritten with the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, Pub.L. No. 104-132, 110 Stat. 1214. *See Lindh v. Murphy*, 521 U.S. 320 (1997). Section 2254(a) confers federal habeas jurisdiction for the limited purpose of determining

4

whether a habeas petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Section 2254(d), added by the AEDPA, imposed a limitation on a federal court's power to grant relief. It provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). *See also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000) (plurality opinion) (discussing § 2254(d)).[5]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. at 404-05. Thus, this court *may* issue a writ of habeas corpus pursuant to § 2254(d)(1) only if it determines that the state court adjudication of Petitioner's claims was *either* contrary to *or* an unreasonable application of clearly established federal law. When making this determination, this court examines the last reasoned decision by the state court. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-02 (1991).

"The phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' requires that federal courts assess the validity of the inmate's claims based on the holdings of the Supreme Court 'as of the time of the relevant state-court decision.'" *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005) (citing *Williams v. Taylor*, 529 U.S. at 412). Under §

---

[5]"The inquiry mandated . . . relates to the way in which a federal habeas court exercises its duty to decide constitutional questions; the amendment does not alter the underlying grant of jurisdiction in § 2254(a) . . . ." *Williams v. Taylor*, 529 U.S. 362, 378 (2000) (plurality opinion).

2254(d)(1)'s "contrary to" prong, "[a] state-court decision will certainly be contrary to [ ] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases," *Williams v. Taylor*, 529 U.S. at 405, or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Id.* at 405-06. *See also Bell v. Cone*, 535 U.S. 685, 694 (2002). A state habeas court unreasonably applies clearly established federal law when it "identifies the correct legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. at 413. If the state court's decision was incorrect but still reasonable, § 2254 relief is not available. *Id.* at 411-12. As the Court noted,

> an *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable.

*Id.* at 409-11. Thus, in order to grant a habeas petition under the "unreasonable application" clause of § 2254(d)(1), the federal court must conclude the state court's adjudication of the prisoner's claims was not only incorrect, but also objectively unreasonable. *Id. See also Humphries v. Ozmint*, 397 F.3d 206, 215-16 (4th Cir. 2005).

Relief may be granted under § 2254(d)(2) if the state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." However, factual findings by the state court "shall be presumed to be correct," a presumption that will be rebutted only "by clear and convincing evidence." *Id.* § 2254(e)(1). The presumption of correctness imposed by § 2254(e)(1) applies to findings by state appellate courts as well as trial courts. *Sumner v. Mata*, 449 U.S. 539, 545-47

(1981) (construing prior version of statute).

Section 2254(d) requires that "state court decisions be given the benefit of the doubt." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002). "Readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Id.* Additionally, "[w]hen the state court decision being reviewed by a federal habeas court fails to provide any rationale for its decision, [a federal court] still appl[ies] the deferential standard of review mandated by Congress . . . ." *Fullwood v. Lee*, 290 F.3d 663, 677 (4th Cir. 2002) (citing *Bell v. Jarvis*, 236 F.3d 149, 158, 163 (4th Cir.2000) (en banc)).

## FACTS

Taken from the record of this case, the facts are as follows:[6]  On the morning of June 19, 1991, the bodies of Linda (Linda) and Shaun (Shaun) Williams, the wife and 12-year-old son of Petitioner, were discovered inside the partially-burned family van in rural Edgefield County, South Carolina.  This location was approximately six miles from the decedents' home in Evans, Georgia. When initially discovered by a United States Forest Service timber sales inspector, the van's doors were locked, the view into the interior of the van was obscured, and the tailpipe of the van was cool to the touch.  Law enforcement was called to the scene.[7]  Law enforcement officers eventually gained access to the interior of the van through a window on the passenger-side sliding door.  No smoke or

---

[6]The record consists of five (5) volumes containing state court proceedings (hereinafter "Appx"), pages 1-2183; an additional volume of state court proceedings filed at the parties' request January 4, 2006 (hereinafter "Appx. 5A"), pages 2002-2353; and copies of materials filed in conjunction with Respondent's Petition for Writ of Certiorari to the South Carolina Supreme Court related to the second PCR. The court notes that page 1186 of the Appendix, a page from the trial transcript, is missing and does not appear to be in the possession of Respondent (who submitted a copy of the state court record to this court).

[7]The van was found off the road with its front bumper against a tree. The inspector who found the vehicle sought entry to the vehicle but decided to call law enforcement personnel when he decided "somethin' [sic] [was not] right." Appx. at 877.

hot air came out of the van when the window was opened. Upon gaining entry, officers detected a strong odor of gasoline. Linda Williams' body was discovered in the driver's seat. Linda was dressed in an oversized grey t-shirt, grey sweat pants pulled down to her upper thigh, light pink socks, and nylon panties. Linda was not wearing a brassiere or shoes, although a pair of shoes was found near her feet. The driver's seat was positioned as far back as it could go.

Witnesses testified at trial that Linda was particular about her appearance and would not have appeared in public wearing an oversized t-shirt without a brassiere. Witnesses also testified Linda was short in stature and drove the van with the driver's seat very close to the steering wheel.

Shaun's body was discovered in the van's front passenger seat. Shaun was also dressed in a t-shirt and sweat pants, and was not wearing his eyeglasses, which were present on the floorboard of the van between his legs. A pair of Shaun's shoes was found in the vehicle near, but not on, his feet. Both bodies were "slumped forward" in their seats, with Shaun having "come forward and [ ] pressed against the shoulder harness of the seat belt." Appx. at 918.

The last time anyone spoke to Linda was around 2:50 p.m. on June 18, 1991. A neighbor testified an unidentified car pulled into the Williams' driveway between 1:00 and 2:00 a.m. on June 19, 1991. Another neighbor testified that between 6:45 and 7:00 a.m. on June 19, 1991, she took her trash out and noticed the van was not in the Williams' driveway.

An autopsy conducted June 20, 1991, revealed Linda's cause of death was blunt trauma to the head, consistent with blows having been inflicted by a human fist.[8] Shaun had been asphyxiated by manual strangulation, as there were multiple abrasions and contusions on both sides of Shaun's

---

[8]Linda suffered a left black eye, a contusion on the bridge of her nose, and contusions on her left forearm that were likely defensive in nature. Linda also suffered three post-mortem abrasions on her shoulders. The blunt trauma caused significant hemorrhaging beneath the scalp which was found on internal examination by the Medical Examiner. These wounds were in addition to any resulting disfiguration from the fire.

neck, consistent with finger and fingernail marks.[9] Wounds caused to the decedents by the fire were post-mortem. The Medical Examiner who testified at trial indicated he was unable to determine a specific time of death.[10] On June 23, 1991, four days after the bodies were discovered, a physician examined Petitioner's right hand and found it to be swollen and blue from an injury that was likely three to four days old.[11]

Law enforcement officers recovered a piece of white PVC[12] pipe from the van's floorboard. This PVC pipe was found to have human blood on it, but further testing was unable to identify the blood group typing. The van also contained a flashlight, a pack of matches, and several containers of what was later determined to be gasoline. Officers also recovered Linda's closed purse, which was between the seats. The purse was undamaged by the fire. Officers opened the purse, and found identifying documents and money.

Law enforcement officers traced the van's license plates to determine the family's address. Officers of both the Edgefield County Sheriff's Department and the Columbia County, Georgia, Sheriff's Department thereafter proceeded to that address, arriving at approximately 4:30 p.m. on June 19, 1991. Petitioner was not at home when law enforcement personnel arrived, but arrived while officers were there. After confirming his identification, law enforcement personnel

---

[9]Shaun's other injuries consisted of a large bruise on his right forehead, and abrasions to his chin, back and right side of his neck.

[10]Dr. Clay Nichols testified Linda's death could have been immediate or within "a couple of hours" of the beating. Appx. at 1002. Dr. Nichols also testified Linda and Shaun's deaths "could've taken place within the reasonable [sic] same time frame," *id.* at 1013, but that because of the fire and other factors, he was unable to give a time of death within a reasonable degree of medical certainty. *Id.* at 1015.

[11]The examining doctor noted an injury to Petitioner's right hand. An x-ray revealed the absence of a fracture, but the physician did feel "a palpable mass" which felt like a "clot of blood." Appx. at 1099-1102.

[12]PVC stands for "polyvinal chloride."

accompanied Petitioner inside his home where he was informed of the death of his wife and child. Upon being told of Linda and Shaun's deaths, Petitioner asked, "How do you know it was my wife and child?" and "Well, was it an accident?" Appx. at 1068. Petitioner gave officers permission to search the house. A bath towel containing what appeared to be blood stains was recovered from the laundry room, and a pair of tennis shoes with what appeared to be blood stains was found in Petitioner's bedroom. Later tests on these items were positive for the presence of human blood, but were inconclusive at to any blood group typing. After Petitioner was notified of his wife and son's deaths, and while law enforcement officers were still present in Petitioner's residence, Petitioner went to let his dog out, left the house to check the mailbox, and (according to testimony of neighbors) waved to neighbors and said, "Hi," before returning inside.

A witness testified at trial that he visited Petitioner and remained with him almost the entire night of June 20, 1991. This witness testified he asked Petitioner how Linda and Shaun had died. According to this witness, Petitioner told him Linda had been beaten and Shaun strangled with a plastic wire wrap. The same witness testified he asked Petitioner where Linda and Shaun were supposed to be on the day of the murder, and Petitioner informed him that they had been traveling to Columbia, South Carolina to do some shopping. The same witness also testified he asked Petitioner "jokingly" if Petitioner had killed Linda and Shaun and that Petitioner had not replied. Appx. at 1298.

The Williamses had filed for Chapter 13 bankruptcy protection in September, 1990.[13] In

---

[13]The opinion of the South Carolina Supreme Court on direct appeal noted that "foreclosure proceedings had been initiated against [Petitioner's] home," *Williams I*, 468 S.E.2d at 629, as evidence of Petitioner and Linda's financial difficulties prior to her death. *See also Williams II*, 611 S.E.2d at 233. However, the record reveals that while Petitioner and Linda were some $10,000 behind in payments on their mortgage around the time of the filing of their Bankruptcy Petition, Appx. at 1338, the lienholder was not given permission by the United States Bankruptcy Judge to *proceed* with a foreclosure until May, 1992, eleven (11) months *after* Linda's death. *See id.* at 1345,

May, 1991, approximately a month and a half before Linda's death, Petitioner signed his wife's name

to an application to increase coverage under an existing Allstate Insurance Company policy on

Linda's life. The policy had been issued in 1990. At the same time, Petitioner signed Linda's name

on an Allstate Insurance application for a new insurance policy offered to Sears credit card holders.[14]

These policies, both Accidental Death and Dismemberment policies, provided a benefit of $200,000

for an automobile-related death of Linda and $45,000 for an automobile-related death of Shaun.[15]

These insurance policies had a "standard beneficiary provision," which meant benefits would accrue

to the spouse. Appx. at 1459. Additionally, Petitioner and Linda took out a new joint life insurance

policy with State Farm Insurance on May 30, 1991, providing coverage for Linda in the amount of

$250,000.[16] At the suggestion of the State Farm employee with whom Petitioner interacted,

---

1346, 1348. There is no evidence in the record regarding when foreclosure proceedings might have been *initiated* against Petitioner and Linda.

[14]Brenda Gaile Heath, a SLED handwriting expert, testified Petitioner had signed Linda's name on both of the Allstate applications, but that he made no attempt to disguise his writing. Appx. at 1498.

[15]Suzanne St. George, a Staff Analyst with Allstate Insurance Company, testified that Linda had, at the time of her death, an existing Accidental Death and Dismemberment Policy, available to Allstate customers, with an enrollment date of February 28, 1990. Allstate received a request, dated May 7, 1991, to upgrade this policy to provide increased benefits for automobile-related and "other" accidental deaths for both Linda and Shaun. St. George also testified Allstate received a separate enrollment form, also dated May 7, 1991, for an additional Accidental Death and Dismemberment policy, available to Sears credit card holders. Linda was the Sears credit card holder. This new policy provided for automobile-related death benefits of $100,000 in the event of Linda's death, and $25,000 in the event of Shaun's death. St. George testified that Petitioner made claims under these two Allstate policies; however, she could not conclusively testify that the second policy (Sears credit card holder policy) was in effect at the time of Linda and Shauns' deaths. Appx. at 1477, 1485.

[16]Petitioner inquired, without Linda being present, about obtaining life insurance with State Farm. Petitioner expressed an interest in taking the application home to have Linda sign it, but the office manager informed Petitioner that Linda would have to come to the State Farm office to sign the application. Linda appeared at the State Farm office in Augusta, Georgia on May 31, 1991, and signed the application. The Williamses applied for a joint policy, with $500,000 in death benefit insurance; however, until the policy was approved, a binder limited the amount of coverage to $250,000.

11

Petitioner also took out a whole life policy on Shaun which provided $25,000 coverage in the event of his death. When Linda appeared at the State Farm office on May 31, 1991, to sign the application for the joint policy, she did not sign the policy application relating to coverage for Shaun. The State Farm joint policy listed Petitioner as the beneficiary in the event of Linda's death. The policy on Shaun listed Petitioner and Linda as joint beneficiaries.[17]

Testimony at trial indicated several neighbors heard Petitioner and Linda arguing loudly on more than one occasion during the spring of 1991. One neighbor reported hearing a "loud thump" come from inside the Williams' home during one of the arguments. Appx. at 1227. Testimony from other witnesses indicated Petitioner and Linda had also engaged in "hostile" telephone conversations during the same time period. *Id.* at 1294.

After the deaths, Petitioner signed and submitted two Allstate Insurance claim forms. Both indicated Linda and Shaun died in Edgefield County, South Carolina.

Petitioner was indicted by an Edgefield County, South Carolina grand jury on September 28, 1992 for the murders of Linda and Shaun. The Solicitor served Petitioner with notice of intent to seek the death penalty on October 1, 1992. The trial began November 15, 1993. At the conclusion of the State's case, Petitioner's counsel moved for a directed verdict, maintaining there was insufficient evidence linking Petitioner to the murders, that venue in Edgefield County was not established, and that the circuit court lacked both subject matter and personal jurisdiction. These motions were denied. Petitioner thereafter chose not to testify or present other evidence. The jury commenced its deliberations on November 21, 1993. After approximately six hours of deliberation, the jury sent out a note stating: "There is a question of actual place of death? [sic] Does the actual

---

[17]Testimony also revealed Linda had life insurance benefits of $36,000 through her employer, the Columbia County, Georgia, school system. On these policies, Linda designated Petitioner and Shaun as beneficiaries.

place of death have to occur in Edgefield County for the jury to render a verdict?" Appx. at 1622. The trial court charged the jury that "the State must satisfy you beyond a reasonable doubt . . . that the fatal blow or blows occurred in Edgefield County, South Carolina." *Id.* at 1623. Three hours later, the jury returned verdicts of guilty as to both murders.

The penalty phase of Petitioner's trial commenced November 22, 1993. The State presented three witnesses, and Petitioner presented four witnesses in mitigation. Petitioner chose to address the jury during closing argument. Thereafter, during the penalty-phase charge conference, Petitioner's trial counsel requested, *inter alia*, that the trial court charge the jury that if he were sentenced to life imprisonment, Petitioner would not be eligible for parole for at least thirty years.[18] The trial court denied the requested charge, relying on *State v. Torrence*, 406 S.E.2d 315 (S.C. 1991), and stated: "I would instruct the jury if it's asked that it shall not consider parole eligibility in reachin' [sic] its decision and the terms life imprisonment and death sentence should be understood in their plain – in their ordinary and plain meaning." Appx. at 1723.

On November 23, 1993, the jury unanimously recommended Petitioner receive the death penalty as to each murder. The jury found beyond a reasonable doubt the existence of two statutory aggravating circumstances: (1) that Petitioner committed the murders to receive money or a thing of monetary value; and (2) that two or more persons were murdered by one act or pursuant to one scheme or course of conduct.[19]  On November 23, 1993, the trial court followed the jury's

---

[18]Trial counsel also requested that the court charge that Petitioner would not be parole-eligible for twenty years if the jury did not find either of the statutory aggravating factors.

[19]The trial court had charged the jury it should also consider several statutory mitigating circumstances argued by Petitioner, namely: (1) that Petitioner had no significant history or prior criminal conviction involving the use of violence against another person; (2) that the murder was committed while Petitioner was under the influence of mental or emotional disturbances; and (3) that the capacity of Petitioner to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired. The trial court also charged the jury that it should consider any other non-statutory mitigating factors during its deliberations. Appx. at 1778.

recommendation and imposed two death sentences. Petitioner's direct appeal and two PCRs followed, and the current § 2254 petition was filed in this court on July 13, 2005.

## DISCUSSION

### I. Insufficient Evidence to Support Conviction Under Due Process Clause of Fourteenth Amendment

Petitioner argues in his first ground for relief that his conviction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the circumstantial evidence presented by the State was constitutionally insufficient to support the guilty verdicts. More specifically, Petitioner contends that the evidence was insufficient to prove that he killed his wife and child or that they were killed in South Carolina. The South Carolina Supreme Court rejected this argument on appeal, finding that the "record provides evidence from which [Petitioner's] guilt could fairly and logically be deduced . . . ." *Williams I*, 468 S.E.2d at 630.

The evidence considered by the jury included testimony: that Petitioner and Linda had experienced financial difficulties several times during the course of their 17-year marriage and that Linda's parents had helped the Williamses financially "many times," Appx. at 1271; that Petitioner and Linda had filed a bankruptcy petition in September, 1990; that Petitioner and Linda engaged in loud verbal arguments overheard by neighbors;[20] that Petitioner and Linda engaged in "kinda hostile"

---

[20]A neighbor, David Dawayne Brown, testified he did not know Petitioner or Linda "very well," and that in the six months prior to the homicides, he had heard "arguing" coming from the Williams' house, that it was "frequent," and "more than once a month." Appx. at 1203, 1205, 1206. However, on cross-examination, Brown testified he had heard arguments "two or three, maybe four times." *Id.* at 1212. Another neighbor, Donna Gabbard, testified she had heard Petitioner and Linda arguing "four or five times out of a month . . . about once a week." *Id.* at 1226. Gabbard also testified she had heard "a loud thump . . . like something was knocked over . . . [coming] from inside the house." *Id.* at 1227. Gabbard testified the arguments had occurred "day or night. It just depend[ed] on whether they were both at home . . . [A] good bit of it was in the evenin' [sic] but once in a while on weekends it would be in the day." *Id.* There was no time frame attached to Gabbard's testimony. Gabbard's testimony regarding frequency of arguments was not challenged on cross-examination.

telephone calls during a several-month period prior to Linda's death;[21] that Petitioner signed Linda's name on insurance forms which would provide increased benefits to Petitioner in the event of both Linda and Shaun's deaths; that Petitioner and Linda purchased a relatively large joint life insurance policy, albeit with Linda's participation, that would provide benefits to Petitioner in the event of the death of both Linda and Shaun; that Petitioner had behaved in an unusual manner upon being told of the death of his wife and son; that Petitioner's hand had a visible injury a few days after the murders, consistent with having been inflicted around the time of the beating death of Linda; that Petitioner had knowledge of the manner of death of Linda and Shaun prior to receiving the results of the autopsy;[22] and that Petitioner failed to deny he had anything to do with the death of his spouse

---

[21]Two individuals who were students at Augusta Technical Institute with Petitioner testified that Petitioner received telephone calls which were "kinda hostile" while Petitioner was on the campus of Augusta Technical Institute. Appx. at 1294. The testimony of Deaun Rene McNair revealed Petitioner was "angry after one particular phone call" from Linda, *id.* at 1285, and that "[t]hey had had a quite heated discussion about some bill or another that had gotten paid or not gotten paid. It [the telephone call] was in reference to a bill." *Id.* at 1285-86. McNair also testified that Petitioner "wasn't happy in the marriage as far as I can remember." *Id.* at 1286. On cross-examination, McNair testified that she had graduated from Augusta Technical Institute in March, 1991, that she had known Petitioner "[t]he quarter that I was there three months," *id.* at 1289, and that she had been in an "unhappy marriage" during the time she knew Petitioner. *Id.* at 1288.

[22]Petitioner contends "the state court's reliance on [P]etitioner's statements [regarding the cause of death of Linda and Shaun recounted above] also fails to account for the distinct possibility that [P]etitioner had been provided with information about the condition of the bodies from one or more law enforcement officers." Pet. at 19 n.3, filed Aug. 31, 2005. The autopsy was performed beginning at 9:30 a.m. on June 20, 1991, the day after the murders. The record does not reveal when the autopsy concluded. Testimony by a friend of Petitioner, Thomas Wright, established Petitioner told him on the evening of June 20, 1991 that Linda had been beaten to death and Shaun had been "choked or strangled with a plastic wire wrap," similar to wraps Shaun had in his bedroom, "just like the one that was found at the scene . . . ." Appx. at 1296. If the autopsy results had already been provided to Petitioner, it is unlikely Petitioner would have indicated Shaun had been strangled in a manner different, *i.e.*, by a wire wrap, than that found by the Medical Examiner (manual strangulation). Additionally, Petitioner testified at the first PCR hearing, held August 18, 1998, that law enforcement had told him that Linda and Shaun had "burned to death in a fire." Appx. 5A at 2114.

    Petitioner also contends that "[t]he fact that Linda Williams had been beaten was obvious to anyone who had seen her body, including the officers who visited and spoke with [P]etitioner on the day the bodies were discovered." Reply at 28, filed Oct. 31, 2005. However, there is nothing

and child when asked this by a friend on the day after the murders.

When a habeas petition challenges the constitutional sufficiency of the evidence to support a judgment of conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). From this court's independent review of the state court record and application of the "rational factfinder" evidentiary standard, the court is satisfied that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In addition, it cannot be said the findings of the South Carolina Supreme Court on the issue of guilt were either contrary to or involved an unreasonable application of the *Jackson* standard under § 2254(d)(1).[23]

Petitioner also raises a sufficiency argument pertaining to the location of the homicides. This is, essentially, an argument that the State failed to prove the venue of the crimes beyond a reasonable doubt. Petitioner asserts the South Carolina Supreme Court "could not have reasonably concluded to any degree of certainty that the homicides occurred in South Carolina and not in Georgia." Reply at 20, filed Oct. 31, 2005. The South Carolina Supreme Court found that "[a]lthough there is evidence that some of the acts material to the homicides may have been committed in Georgia, the deaths occurred sometime between the time the victims were last seen in Georgia and the time the

---

in the record from any of the testifying law enforcement officers as to what they may or may not have observed about Linda and Shaun's condition other than the fact that they were burned. The only testimony relating to Linda's visible external injuries came from the Medical Examiner, who noted these injuries during the autopsy. *See* Appx. at 991.

[23]The South Carolina Supreme Court did not cite *Jackson* in its determination, yet this is not necessary. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding state courts not required to cite applicable United States Supreme Court cases or even be aware of them to satisfy § 2254(d)(1) standard). *See also Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (same).

fire stared in the van in South Carolina." *Williams I*, 468 S.E.2d at 630. Noting that it was not necessary for the State to affirmatively prove venue "if there [was] sufficient evidence from which it [could have been] inferred," the South Carolina Supreme Court determined "there was sufficient evidence from which a trier of fact could reasonably infer that the victims died [in Edgefield County, South Carolina]." *Id.*

There is evidence in the record that a friend spoke with Linda at 2:50 p.m. on June 18, 1991;[24] that an unidentified car pulled into the Williams' driveway between 1:00 and 2:00 a.m. on June 19, 1991;[25] that between 6:45 and 7:00 a.m. on June 19, 1991, a neighbor noticed the van was not in Petitioner's driveway;[26] that the bodies were discovered in the partially-burned van in Edgefield County around 11:00 a.m. on June 19, 1991; that the van was discovered approximately six miles from the decedents' home in Georgia; that Linda and Shaun were deceased before the fire started; that the Medical Examiner believed the fatal blows were likely struck outside the van, and the bodies placed in the van after death; that vines were caught in the locked doors of the van;[27] that a piece of PVC pipe which had human blood on it was found in the van; that a towel and a pair of

---

[24]Jane Vaughn, a co-worker and friend of Linda, testified that she telephoned Linda at 2:50 p.m. on June 18, 1991, to discuss a previously-made arrangement regarding obtaining some meat. Appx. at 1175. Vaughn testified that "when I first called her I mentioned that she might come and pick me up because I didn't have a way to go [pick up the meat], but she told me that she didn't have a way to go also." *Id.* at 1176. There is no further exploration of this testimony by either the Solicitor or defense counsel, although defense counsel mentioned the testimony in his closing argument. *See id.* at 1582.

[25]Donna Gabbard testified that the car which pulled into the Williams' driveway "[j]ust pulled up right in behind the van." Appx. at 1232.

[26]This same neighbor did not notice whether the van was present at any point during the two preceding days.

[27]The testimony of Joel Summer, an officer with the Edgefield County Sheriff's Department, indicated that he observed that the rear cargo door and the driver's door had been closed on vines. Appx. at 890-91. *See also* testimony of Mike Goodman, Appx. at 1058-59.

tennis shoes with human blood on them were found in Petitioner's home in Evans, Georgia;[28] and that Petitioner signed two Allstate Insurance claim forms indicating Linda and Shaun's place of death was in Edgefield County, South Carolina.[29]

Six hours into its deliberations, the jury sent a note to the court. The note read: "There is a question of actual place of death? [sic] Does the actual death have to occur in Edgefield County for the jury to render a verdict?" Appx. at 1622. The court instructed the jury that, *inter alia*, the State had to prove beyond a reasonable doubt that the fatal blow or blows occurred in Edgefield County. Three hours later, the jury rendered a guilty verdict on both indictments.

*Jackson* requires that a reviewing court determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. "[A] federal habeas court faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

As noted above, the South Carolina Supreme Court applied the *Jackson* standard to find sufficient evidence in the record for a trier of fact to reasonably infer the victims died in South Carolina. *Williams I*, 468 S.E.2d at 630. Petitioner provides no argument–aside from his disagreement with the evaluation of the evidence–that the decision of the South Carolina Supreme Court was either contrary to, or an unreasonable application of, *Jackson*. Moreover, after an independent review of the record, this court agrees with the South Carolina Supreme Court that "there was sufficient circumstantial evidence, although not conclusive, to support the inference that

---

[28]None of this blood was matched with that of either decedent.

[29]These insurance forms are discussed in Petitioner's second ground for relief, discussed *infra*.

the victims died in Edgefield County, South Carolina. . . ." *Id.* Accordingly, a rational trier of fact could have found that the crimes occurred in Edgefield County, South Carolina.

For these reasons, the court finds the decision of the South Carolina Supreme Court was not contrary to, nor an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this ground. Respondent's motion for summary judgment is granted and this ground is dismissed with prejudice.

## II. Ineffective Assistance of Counsel – Insurance Claim Forms

Petitioner's second ground for relief asserts his trial counsel was ineffective under the Sixth Amendment in failing to present available evidence challenging insurance claim forms entered into evidence by the State. Petitioner also alleges trial counsel was ineffective in failing to argue that these forms were not concessions by Petitioner. This ground was presented to the PCR court in Petitioner's first PCR application. Upon the first PCR court's denial of this ground, Petitioner filed a petition for writ of certiorari to the South Carolina Supreme Court, which was denied October 10, 2001.[30]

The standard governing ineffective assistance of counsel claims is found in *Strickland v. Washington*, 466 U.S. 668 (1984). In order to succeed on such a claim, Petitioner must show his counsel's performance was "deficient," *Strickland*, 466 U.S. at 687-88, and that such deficiency resulted in actual prejudice to Petitioner. *Id.* As to the first prong of the *Strickland* test, a defense attorney's conduct is deficient if it fails to meet a standard of "reasonably effective assistance." *Id.* at 687. The question whether counsel's performance was deficient may only be answered by viewing counsel's actions or decisions in the light of all surrounding circumstances at the time the

_____

[30]The findings of the first PCR court are reviewed here as this was the last state court to make a determination on the merits.

decision was made, not in the artificial light of hindsight. *Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. *See also Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995). To this end, a reviewing court should not second-guess defense counsel's tactical decisions. *See McDougall v. Dixon*, 921 F.2d 518, 537-39 (4th Cir. 1990).

In addition to showing ineffective representation, Petitioner must also show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," as the court applies a "heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 689-91. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689.

Petitioner claims trial counsel was ineffective in failing to call as a witness Edward Stalnaker (Stalnaker), a civil attorney practicing mainly in the Augusta, Georgia, area. Stalnaker assisted Petitioner in completing and filing the two Allstate Insurance Company claim forms which were admitted into evidence during the guilt phase of Petitioner's trial. Petitioner contended in his first PCR application that these forms, which listed South Carolina as the place of accident and death, were filled out by Stalnaker and that he (Petitioner) simply signed the forms. The first PCR court

heard testimony from Stalnaker, Petitioner's trial counsel, and Petitioner.

During the first PCR hearing held August 19, 1998, Stalnaker testified on direct examination that the information regarding the place of death came from the South Carolina death certificates, Appx. 5A at 2073-74, and that if he had been asked to testify during Petitioner's criminal trial, he would have been willing to testify if "[Petitioner] had not objected and it would not have been a violation of our attorney-client relationship . . . ." *Id.* at 2076. On cross-examination Stalnaker conceded he could not testify that Petitioner did not have any input into the claim forms, and that he reviewed the forms with Petitioner before they were filed with the insurance company. However, Stalnaker later equivocated, testifying he did not recall whether he was present when Petitioner signed the final version of the forms that went to the insurance company.

Petitioner also testified during the first PCR hearing. Petitioner testified that he depended upon Stalnaker to complete the forms, but that he had agreed with everything on the forms when he signed them.

Petitioner's trial attorney testified that he had been aware of the insurance claim forms; that Petitioner had given him differing accounts of the preparation of the forms; and that Stalnaker had not informed trial counsel that he (Stalnaker) had prepared the forms. Trial counsel testified that he had a dilemma about calling Stalnaker as a witness during the criminal trial. Trial counsel testified that Stalnaker "didn't wanna [sic] be in South Carolina. . . . He didn't wanna [sic] go near the witness stand. . . . Because [Petitioner] and him [sic] had had conversations about what to put down, what had occurred. Mr. Stalnaker was also privy to some information that I had 'cause [sic] he had contacted me." Appx. 5A at 2194. Trial counsel also testified he believed that had Stalnaker testified, Petitioner "would've been damaged." *Id.* at 2195. Trial counsel went on to testify:

> [A:]  It was very clear to me that [Petitioner] and Mr. Stalnaker had had certain
> conversations regarding –

Q: [State's attorney] Did [Petitioner] tell you this?

A: [Petitioner] told me that he had – . . . gone to Mr. Stalnaker in anticipation that there would be problems in collecting the life insurance. He had hired him 2 or 3 days after the death. Mr. Stalnaker told me that he was quote after having talked to [Petitioner] on the horns of a dilemma. He wasn't sure where to file the claim forms, **what state to claim they were in** and to wait till [sic] the last minute to file the claim forms which, I believe in Georgia . . . would have to be filed within one year."

*Id.* at 2195-96 (emphasis added).

The first PCR court applied the *Strickland* standard in finding Petitioner's trial counsel had "made a strategic decision (with obvious ethical considerations) not to call Mr. Stalnaker." Appx. 5A at 2346. The first PCR court determined trial counsel was not ineffective, but even if he was, there was no resulting prejudice because "[b]y properly executing the documents, an inference may still be drawn that [Petitioner] agreed that the place of death was Edgefield County. Further, that the bodies were found in Edgefield County is some evidence from which the jury could infer that the deaths occurred there under South Carolina law." *Id.* The first PCR court therefore found no resulting prejudice. The first PCR court's determination on this issue was neither contrary to, nor an unreasonable application of, the *Strickland* standard under § 2254(d)(1).

This court's independent analysis of counsel's actions reveals Petitioner has not made out a viable Sixth Amendment claim for ineffective assistance of counsel. Trial counsel made a reasonable, strategic decision not to call Stalnaker as a witness. There is no dispute that trial counsel determined that testimony by Stalnaker would damage Petitioner. Additionally, Petitioner has failed to present sufficient evidence showing a reasonable probability that, had Stalnaker's testimony been presented, the results of the proceeding would have been different. Thus, the court finds Respondent is entitled to summary judgment on this ground and it is dismissed with prejudice.

### III. Ineffective Assistance of Counsel – Failure to Request a "Plain Meaning" Charge

Petitioner's third ground for relief presents the issue upon which the second PCR court

vacated Petitioner's death sentences. Petitioner asserts in this ground that his trial counsel was ineffective in failing to request a "plain and ordinary meaning" jury charge during the penalty phase of the trial. The South Carolina Supreme Court agreed with the second PCR court that trial counsel was ineffective, but reversed the grant of a new sentencing trial, finding Petitioner was not prejudiced by trial counsel's failure to request this charge.

Petitioner asserts the South Carolina Supreme Court's decision is "an unreasonable application of governing United States Supreme Court precedent to the facts of a state criminal case." Reply at 34, filed Oct. 31, 2005. Respondent maintains that the South Carolina Supreme Court's decision was "reasonable under 2254(d)(1) and (2)." Ret. and Mem. Supp. at 29, filed Aug. 31, 2005.

### A. South Carolina's "plain and ordinary meaning" charge

The history of the "plain and ordinary meaning" jury charge (hereinafter "plain meaning" charge) under South Carolina law is relatively straightforward. In *State v. Norris*, 328 S.E.2d 339, 344 (S.C. 1985), the South Carolina Supreme Court directed that when capital juries inquired about parole eligibility, "the Court should instruct the jury that it shall not consider parole eligibility in reaching its decision, and that the terms 'life imprisonment' and 'death sentence' should be understood in their ordinary and plain meaning."[31] Two years later, the South Carolina Supreme Court decided *State v. Atkins*, 360 S.E.2d 302 (S.C. 1987), *overruled in part by State v. Torrence*, 406 S.E.2d 315 (S.C. 1991). In *Atkins*, the court held that "[i]n all death penalty cases which proceed to trial after this opinion is published, *if requested by the defendant*, the trial judge shall charge the

---

[31]The South Carolina Supreme Court directed this explanation of the term "life imprisonment" in reiterating that a capital jury's role in death penalty cases is limited. *See State v. Plath*, 313 S.E.2d 619, 627 (S.C. 1984) ("Such determinations as the time, place, manner, and conditions of execution or incarceration, as well as the matter of parole are reserved by statute and our cases to agencies other than the jury.").

jury that the term 'life imprisonment' is to be understood in its ordinary and plain meaning." *Atkins*, 360 S.E.2d at 305 (emphasis added). The *Atkins* court also held that in subsequent death penalty cases controlled by the Omnibus Criminal Justice Improvements Act of 1986, 1986 S.C. Acts. 2955, defendants were entitled, upon request, to a parole eligibility charge, in lieu of a "plain meaning" charge.[32]

In *State v. Smith*, 381 S.E.2d 724 (S.C. 1989), *cert. denied*, 494 U.S. 1060 (1990), where the 1986 Omnibus Act was not applicable (because it was enacted subsequent to the murders involved), the court affirmed the use of a "plain meaning" charge in response to a jury note asking about the meaning of life in prison, specifically regarding parole. Although error was urged as to the failure of the judge to instruct the jury not to consider parole, the court noted that "[i]n it's 'ordinary and plain meaning', 'life imprisonment' can mean only what it says–in prison for life. Being imprisoned for life and being paroled are mutually exclusive propositions. . . . [A] 'life imprisonment in its ordinary and plain meaning' charge necessarily precludes jury consideration of parole eligibility." *Smith*, 381 S.E.2d at 727.

Four years after *Atkins*, a majority of the South Carolina Supreme Court overruled *Atkins* to

---

[32]The parole eligibility charge approved in *Atkins* was as follows:

> A person who is convicted of murder must be punished by death or by imprisonment for life. When the state seeks the death penalty and a statutory aggravating circumstance is specifically found beyond a reasonable doubt, and a recommendation of death is not made, the trial court must impose a sentence of life imprisonment without eligibility for parole until the service of thirty years. When a statutory aggravating circumstance is not found beyond a reasonable doubt, the defendant shall be sentenced to life imprisonment and he shall not be eligible for parole until the service of twenty years. No person sentenced under either of the sentencing schemes just explained may receive any work-release credits, good-time credits, or any other credit that would reduce the mandatory imprisonment.

*Atkins*, 360 S.E.2d at 300.

the extent it permitted informing juries concerning a capital defendant's parole eligibility. *See State v. Torrence*, 406 S.E.2d 315 (S.C. 1991) (Chandler, J., concurring).  Less than four months later, the court clarified *Torrence* by noting that "*Torrence* leaves intact the defendant's right upon request for a plain meaning charge." *State v. Davis*, 411 S.E.2d 220, 222 (S.C. 1991).  The *Davis* court determined *Torrence* had not eliminated a defendant's right to a "plain meaning" charge because a "plain meaning" charge was an alternative to a parole eligibility charge. *Id.* at 222.  The court held that "where a capital defendant requests it, a charge must be given at the sentencing phase that the term life imprisonment is to be understood in its ordinary and plain meaning.  It is reversible error to refuse such a request." *Id.*[33]  Thus, at the time of Petitioner's trial, he was entitled under South Carolina law to a "plain meaning" charge on request.  This was the case regardless of his parole eligibility.[34]

In *Simmons v. South Carolina*, 512 U.S. 154 (1994), the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment required that the jury be informed of Simmons' parole ineligibility because the prosecution had raised Simmons' future dangerousness as a reason to impose the death penalty. *Simmons*, 512 U.S. at 156.  Simmons had previously been convicted of two separate, violent felonies.  Under South Carolina law, therefore, Simmons would not have been eligible for parole.  The Court acknowledged it generally "defer[red] to a State's determination as to what a jury should and should not be told about sentencing." *Id.* at 168.

---

[33]Entitlement to a "plain meaning" charge has been held to exist regardless of whether an offender would actually be parole eligible. *Southerland v. State*, 524 S.E.2d 833, 834 (S.C. 1999).

[34]The law applicable to Petitioner's case provided that if the jury found a defendant eligible for the death penalty by finding the presence of a statutory aggravating factor beyond a reasonable doubt, yet decided to impose a life sentence, the defendant would be eligible for parole in thirty years.  If, however, the jury did not find the defendant eligible for the death penalty because it did not find the presence of a statutory aggravating factor beyond a reasonable doubt, the defendant would be sentenced to life imprisonment, eligible for parole in twenty years. S.C. Code Ann. § 16-3-20(A) (1986) (current version of statute last amended 2002).

However, because "[t]he State [ ] succeeded in securing a death sentence on the ground, at least in part, of [Simmons'] future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its noncapital sentencing alternative . . . ," *Id.* at 162, the Court found a violation of Simmons' Fourteenth Amendment's Due Process right.[35]  Subsequent decisions by the Court have established that Due Process requires a parole ineligibility charge–if applicable–whether or not the jury demonstrates any confusion on what a life sentence actually means. *See Shafer v. South Carolina*, 532 U.S. 36 (2001); *Kelly v. South Carolina*, 534 U.S. 246 (2002).[36]

After *Simmons*, the South Carolina Supreme Court, in Petitioner's direct appeal, reaffirmed its view that a "plain meaning" charge is required on request. *See Williams I*, 468 S.E.2d at 632. Moreover, the South Carolina Supreme Court subsequently concluded that the failure to raise on appeal a trial judge's refusal to give a requested "plain meaning" charge constituted ineffective assistance of appellate counsel warranting reversal of the sentencing phase of a death penalty trial. *Southerland v. State*, 524 S.E.2d 833 (S.C. 1999).

### B. Petitioner's case

During the penalty phase of Petitioner's trial, counsel requested the court give a "parole

---

[35]In *Simmons*, Respondent argued that because a "plain meaning" charge was given, there was no Due Process violation. *See Simmons*, 512 U.S. at 170. Here Respondent argues the opposite: that a "plain meaning" charge would have made no difference. The Supreme Court, in *Simmons*, found the "plain meaning" charge an inadequate substitute for a parole ineligibility charge, where the defendant was ineligible for parole and where the State argued future dangerousness. *Id.* ("An instruction directing juries that life imprisonment should be understood in its 'plain and ordinary' meaning does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment.'").

[36]Petitioner has acknowledged that he would have been eligible for parole after service of thirty years' incarceration. Reply at 37, filed Oct. 31, 2005. *See also* Brief of Respondent [Petitioner] filed in South Carolina Supreme Court November 22, 2004, at 12 (noting Petitioner was not entitled to life-without-parole instruction), Dkt. #16, filed in this court Dec. 9, 2005. Therefore, he would not have been entitled to a *Simmons* charge. *See Ramdass v. Angelone*, 530 U.S. 156, 169 (2000); *Campbell v. Polk*, ___ F.3d ___, 2006 WL 1237256 at *16 (4th Cir. May 10, 2006).

eligibility charge"; that is, if the jury found a statutory aggravating factor and, instead of death, chose life imprisonment, Petitioner would not be eligible for parole for thirty years.[37] The Solicitor objected based upon South Carolina law, and the trial court sustained the objection. The trial court indicated that "I would instruct the jury if it's asked that it shall not consider parole eligibility in reachin' [sic] its decision and the terms life imprisonment and death sentence should be understood in their plain – in their ordinary and plain meaning."[38] Appx. at 1723. Trial counsel did not, at that point, request a "plain meaning" charge, nor did he thereafter object to the charge as given.

During closing arguments in the penalty phase, one of Petitioner's attorneys stated: "The judge is gonna [sic] tell you that life in prison means life in prison. The rest of your natural life. You heard testimony the man is 41 years old. We're talkin' [sic] about the rest of his natural life." Appx. at 1750. Counsel also told the jury that "[y]ou found him guilty and this man is gonna [sic] be in prison for the rest of his life." Id. at 1754.[39] There was no objection by the State to this argument by counsel. The Solicitor, however, had argued that imposing "only a life sentence" would indicate that the jurors "forgave" Petitioner, and would be the equivalent of a "pat on the back . . . ." Appx. at 1738, 1746.

During the court's charge to the jury in the penalty phase, the court instructed the jury several

---

[37]Petitioner's counsel also asked for a twenty-year parole eligibility charge in the event the jury did not find any statutory aggravating circumstances.

[38]This statement by the trial court reflected a misunderstanding of South Carolina law at the time. A "plain meaning" charge was available to Petitioner, at his request, in the court's penalty phase jury charge, not just upon a jury question. See State v. Davis, 411 S.E.2d 220, 222 (S.C. 1991) "[State v.] Torrence[, 406 S.E.2d 315 (S.C. 1991)] leaves intact the defendant's right upon request for a plain meaning charge.").

[39]Later Petitioner's other trial counsel argued: "I'm not askin' [sic] you to put this man out on the street because you found him guilty. I'm not askin' [sic] you to send him to a nice little place. I'm askin' [sic] you to permit him something that maybe he's not even entitled to himself, maybe is to spend the rest of his life in a miserable place." Appx. at 1762.

times it had two choices – to recommend imposition of the death penalty or life imprisonment. The court reviewed these choices with the jury, which depended on whether the jury found statutory aggravating factors. The court told the jury that it (the court) was required to impose the sentence the jury recommended. Appx. at 1768, 1772 ("[W]hatever sentence you recommend, be it life or death, I must by law follow that, and so if I say recommend I mean that I will do exactly what you recommend."). However, at no point did the court define "life imprisonment," or instruct the jury that "life imprisonment" was to be understood in its plain and ordinary meaning. Petitioner's counsel did not object to the charge. There were no jury questions during the penalty phase of the deliberations.

Petitioner raised this failure to request a "plain meaning" charge in his second PCR action,[40] contending his trial counsel was ineffective in failing to request this charge.[41] The second PCR court granted Petitioner's PCR application on this ground, finding that "[f]ew rights of capital defendants have been stated with such clarity and frequency as the right to have the trial judge instruct the jury on the meaning of life imprisonment."[42] Appx. at 2179. Finding this right to the instruction to be clearly established under South Carolina law, the second PCR court determined that the "failure of [Petitioner's] counsel to object to the trial court's failure to give this instruction constitutes ineffective assistance of counsel, and warrants resentencing." *Id*. The second PCR court found that

---

[40]Petitioner was granted a second PCR action because the second PCR court found Petitioner's first PCR lead counsel, a Georgia attorney, unqualified under South Carolina statutory law to act in his appointed capacity. *See* Appx. at 2086-87.

[41]Petitioner also raised the failure of the trial court to include a "plain meaning" charge in his direct appeal. However, the South Carolina Supreme Court found that because no such instruction was requested, and because trial counsel failed to object to the charge as given, the issue was not preserved. *Williams I*, 468 S.E.2d at 632.

[42]The court notes that it is the decision of the South Carolina Supreme Court which this court examines under § 2254(d). The findings of the second PCR court are included as background.

trial counsel's uncontroverted testimony at the second PCR evidentiary hearing established counsel "overlooked" requesting the charge. *Id.* The second PCR court also found counsel's actions prejudicial based on the fact that: (1) the State's case was "predominately circumstantial, [with] very little additional evidence in aggravation [ ] offered at the sentencing phase, " *id.* at 2180; (2) Petitioner had no prior criminal record, *id.*; and (3) Petitioner was released on bond prior to trial and allowed to reside out of state for a year.[43] The second PCR court found that "[w]hile the evidence sufficed to support a death sentence, it was far from overwhelming, and the lack of an instruction that informed the jury that life was to be understood in its plain and ordinary meaning was reasonably likely to have made the difference between life and death." *Id.* at 2180-81.

The South Carolina Supreme Court agreed trial counsel's testimony established the deficiency prong of the *Strickland* test. *Williams II*, 611 S.E.2d at 233 ("The PCR judge found that trial counsel's testimony established the error prong of the ineffective assistance test. We agree."). It disagreed, however, with the conclusion that trial counsel's failure to request a "plain meaning" charge prejudiced Petitioner. The South Carolina Supreme Court found that

> [w]hile the factors cited by the PCR judge might support a prejudice finding in some cases, they do not in the context of this case. The evidence, albeit circumstantial, showed that [Petitioner] and his wife were experiencing significant marital problems and financial difficulties, and had in fact declared bankruptcy and seen foreclosure proceedings initiated against their marital home. In May, 1991, [Petitioner] substantially increased life insurance benefits on his wife and child, naming himself as beneficiary. He also forged wife's [sic] signature on an automobile insurance form in the course of increasing that coverage.... We do not agree with the PCR judge's characterization of the evidence of [Petitioner's] guilt as weak. Further, the evidence demonstrated that [Petitioner's] motives were financial gain and the elimination of

---

[43]The second PCR court also noted Petitioner "had remained at liberty during the trial itself, until the jury's guilty verdicts." Appx. at 2180. This factual recitation appears to be incorrect. Petitioner was allowed to remain on bond during the several days of voir dire of the jury venire. However, once the jury was seated but prior to its being sworn, Petitioner's bond was revoked on motion of the Solicitor. *See id.* at 852. *See also* Appx. 5A at 2178 ("In fact, Judge Brown let him remain on bond during the jury selection process.").

his domestic problems. Having achieved what he set out to accomplish, it is not surprising or meaningful that [Petitioner] met the obligations of his bond. Further, given the nature of these crimes, we find the fact that he had no prior criminal record irrelevant to the question whether he was prejudiced by the lack of a "plain meaning" charge.

*Williams II*, 611 S.E.2d at 233-34. The court went on to note that the "plain meaning" charge had

evolved from the court's concern that capital juries were speculating about parole eligibility, but

stated: "[T]here is nothing in this record to indicate that the jurors in [Petitioner's] capital trial were

concerned with parole eligibility, or confused about the meaning of a life sentence." *Id.* at 234. The

court concluded that there was "no evidence in the record to support the PCR judge's conclusion that

[Petitioner] was prejudiced by trial counsel's deficient performance, that is, that had the jury been

given a 'plain meaning' charge there is a reasonable probability that it would have returned two life

sentences."[44] *Id.*

### C. Analysis

Petitioner contends the South Carolina Supreme Court's decision is "a paradigmatic example

of an unreasonable application of governing United States Supreme Court precedent to the facts of

a state criminal case," and "the state court's express refusal to consider mitigating evidence during

its prejudice analysis was contrary to, and led to an unreasonable application of, longstanding

Supreme Court precedent." Reply at 34, filed Oct. 31, 2005. Respondent contends that the findings

of the South Carolina Supreme Court do not warrant this court's grant of relief under either § 2254

(d)(1) or (2).

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy

---

[44]The South Carolina Supreme Court acknowledged that "this court will uphold the PCR judge's findings of fact and conclusions of law if there is any evidence of probative value in the record to support them." *Williams II*, 611 S.E.2d at 233 (citing *Sellers v. State*, 607 S.E.2d 82 (S.C. 2005)). *See also Caprood v. State*, 525 S.E.2d 514, 517 (S.C. 2000) ("This Court gives great deference to the PCR courts [sic] findings of fact and conclusions of law.").

the right . . . to have the Assistance of Counsel for his defence," U.S. Const. amend. VI. Such assistance must be effective. *See Strickland*, 466 U.S. at 686. In order to establish an ineffective assistance of counsel claim, Petitioner must show (1) that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," *id.* at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Petitioner must show that a reasonable probability exists that but for the unprofessional error, "at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). Thus, Petitioner must show by a probability sufficient to undermine confidence in the outcome that the "plain meaning" charge "might well have influenced" at least one juror to choose life imprisonment. *Id.* at 538 (quoting *Williams v. Taylor*, 529 U.S. at 398). The Supreme Court has specifically rejected the contention that a petitioner must establish "a reasonable probability" by a preponderance of the evidence. *Williams v. Taylor*, 529 U.S. at 405-06. *See also Rose v. Lee*, 252 F.3d 676, 689 (4th Cir. 2001) (noting same).

As noted above, the South Carolina Supreme Court determined that by failing to request a "plain meaning" charge, Petitioner's trial counsel committed an error so grave as to satisfy the first prong of *Strickland. Williams II*, 611 S.E.2d at 233. Such an error, is, by definition, "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. This finding, based upon counsel's failure to request a jury charge available under *state law*, is the type of ruling "on which [this court's] deference to the state court

should be at its zenith." *Barnabei v. Angelone*, 214 F.3d 463, 471-72 (4th Cir. 2000), *abrogated on other grounds by Bell v. Jarvis*, 236 F.3d 149, 160 n.7 (4th Cir. 2000) (en banc). *See also Lenz v. Washington*, 444 F.3d 295, 307 (4th Cir. 2006) (same).

Respondent contended during oral argument of this case that it did not concede trial counsel's ineffectiveness. This court declines to engage in a reevaluation of trial counsel's performance, however, as *Respondent* lacks standing to attack this finding of the state supreme court in this federal habeas corpus petition. *See* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus *in behalf of a person in custody* . . . .") (emphasis added). Trial counsel's ineffectiveness was found by two separate courts, and this court determines these decisions were not contrary to, nor an unreasonable application of, clearly established federal law.[45]

---

[45]Even if this court were to reevaluate the state supreme court's finding relating to ineffectiveness, this court would determine its finding to be reasonable. During the charge conference relating to the penalty phase instructions, the focus of Petitioner's trial counsel was on his attempt to get a "parole ineligibility for thirty years" charge (if at least one aggravating circumstance was found by jury). The trial judge denied this request under then-existing state law. The judge then advised that he would give a "plain meaning" charge "if it's asked." Appx. at 1723. Indeed, Respondent acknowledged at oral argument that the judge was required to give a "plain meaning" charge if requested by the defense or if the jury inquired regarding parole eligibility. At Petitioner's second PCR hearing, trial counsel testified that he assumed the judge would give a "plain meaning" charge and could not explain why he failed to object when the charge was not given. This is consistent with the closing arguments by both defense counsel. *See id.* at 1750, 1754, 1762. Respondent, however, maintained in oral argument before this court that counsel's testimony–as to his inadvertence in failing to request the "plain meaning" charge–was not credible, as the jury instructions were available to counsel in writing before the charge was given and because trial counsel indicated he was satisfied with the charge, *see id.* at 2154 ("I think he gave us a fairly well-reasoned charge."). Respondent also argued that trial counsel, having lost his request for a "parole ineligibility for thirty years" charge, did not seek a "plain meaning" charge because he felt it was ineffective under *Simmons*–that it would do "nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines 'life imprisonment[,]'" *Simmons*, 512 U.S. at 170. It is unlikely trial counsel would have been of the mindset advanced by *Simmons*, however, as *Simmons* was yet to be decided at the time of Petitioner's trial, and because the continued importance of the "plain meaning" charge had been the subject of a flurry of South Carolina Supreme Court decisions between 1987 and 1991. Further, Respondent's arguments are directly contrary to the credibility determination of the second

Petitioner has correctly defined the issue on the *Strickland* prejudice prong in this case as follows:  whether counsel's unwitting forfeiture of his client's state-created right to a "plain meaning" instruction was reasonably likely to have affected the outcome of his sentencing hearing. *See* Reply at 37, filed Oct. 31, 2005.  Petitioner is also correct that *Strickland*'s prejudice prong does not include a requirement that counsel's unprofessional error be compounded by some independent federal constitutional defect in the proceedings.  *See Strickland*, 466 U.S. at 694 (discussing the prejudice prong of the ineffectiveness test and noting only that "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

The South Carolina Supreme Court reversed the second PCR court's grant of a new sentencing trial, finding the evidence warranting imposition of the death penalty so strong, and the mitigating evidence so insubstantial, that the lack of a "plain meaning" charge was not reasonably likely to have affected the jury's determination that imposition of the death penalty was warranted. *Williams II*, 611 S.E.2d at 234.[46]  This court must conclude, however, that the determination of no

---

PCR judge, as affirmed by the South Carolina Supreme Court in *Williams II*.

[46]Petitioner contends that his is the first reported case in which the South Carolina Supreme Court has found a lack of *Strickland* prejudice from trial counsel's failure to request a jury instruction where denial of such a request would have required reversal. *See Brunson v. State*, 477 S.E.2d 711 (S.C. 1996); *Riddle v. State*, 418 S.E.2d 308 (S.C. 1992); *Battle v. State*, 409 S.E.2d 400 (S.C. 1991); *Stone v. State*, 363 S.E.2d 903 (1988).  It is significant to this court that while Respondent argued before the South Carolina Supreme Court that the prejudice prong of *Strickland* had not been met, the State's argument did not rest on a reweighing of the evidence at sentencing but rather on the ineffectiveness of the "plain meaning" charge in light of the United States Supreme Court's comments in *Simmons*. *See* Petition for Writ of Certiorari, *Williams v. South Carolina*, 611 S.E.2d 232 (S.C. 2005) (No. 2002-CP-19-012) at 20; Brief of Petitioner, *Williams v. South Carolina*, 611 S.E.2d 232 (S.C. 2005) (No. 2002-CP-19-012) at 15-16.  This argument was not addressed by the South Carolina Supreme Court in its decision in *Williams II*.  Petitioner sought rehearing after receiving the court's opinion, issued without argument, but rehearing was summarily denied. *See Williams II*, 611 S.E.2d at 232 (noting rehearing denied April 20, 2005).

prejudice by the South Carolina Supreme Court was the result of a decision that was contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, namely, *Strickland* and its progeny.

"It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams v. Taylor*, 529 U.S. at 391 (quoting 28 U.S.C. § 2254(d)). *See also Frazer v. South Carolina*, 430 F.3d at 704 ("The two-part test of *Strickland* that [Petitioner] must satisfy in order to prevail on an ineffective assistance of counsel claim unquestionably qualifies as 'clearly established' law under § 2254(d)."). The hallmark of the *Strickland* prejudice test is that while the test has become relatively easy to define, its application necessarily requires a fact-intensive, case-by-case analysis. In *Strickland*, the Court explained as follows:

> The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors. . . . When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer--including an appellate court, to the extent it independently reweighs the evidence--would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96.

This court concludes that there are four ways in which the adjudication of this ground by the South Carolina Supreme Court was contrary to, or involved an unreasonable application of, *Strickland*. First, the state court found the fact that Petitioner had no prior criminal record "irrelevant

to the question whether he was prejudiced by the lack of a 'plain meaning' charge." *Williams II*, 611

S.E.2d at 233-34.   Second, the state court relied on the lack of affirmative evidence of juror

confusion concerning parole to support its conclusion that counsel's failure to secure an appropriate

instruction was not prejudicial.  *Id.* at 234.  Third, the state court failed to consider the likely effect

of the prosecution's closing argument minimizing the effect of a life sentence or the defense

argument that life imprisonment would be defined by the judge to be the remainder of one's natural

life.  Fourth, the state court failed to consider evidence offered in mitigation during the penalty

phase.

### 1.  The state court found Petitioner's lack of prior criminal record irrelevant to the prejudice inquiry.

The South Carolina Supreme Court was required to, and acknowledged that it was required

to, perform a *Strickland* analysis of prejudice in Petitioner's case. *Williams II*, 611 S.E.2d at 233-34.

*But see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding state courts not required to cite

applicable United States Supreme Court cases or even be aware of them to satisfy § 2254(d)(1)

standard); *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (per curiam) (same).  The South Carolina

Supreme Court first noted that the second PCR court had found prejudice because:

> 1.  Petitioner had no criminal record;
>
> 2.  Petitioner had been out on bond prior to trial and remained out until the guilty verdicts were returned;[47] and
>
> 3.  The penalty phase evidence was predominantly circumstantial, far from overwhelming, and the State had relied on this weak evidence in aggravation during the penalty phase.

*Williams II*, 611 S.E.2d at 233.  The South Carolina Supreme Court then proceeded to discuss the

guilt phase evidence, and disagreed with the PCR judge's characterization of the evidence of guilt

---

[47]As noted above, this finding appears to have been incorrect.  The Solicitor moved to revoke Petitioner's bond once the jury was seated, but prior to its being sworn.  Appx. at 852.

as weak. *Id.* The Supreme Court discounted the evidence of good behavior on bond because Petitioner had "achieved what he set out to accomplish . . . ,"[48] namely "financial gain and the elimination of his domestic problems." *Id.* The court found Petitioner's lack of a prior criminal record "irrelevant to the question whether he was prejudiced by the lack of a 'plain meaning' charge" *id.* at 234, "given the nature of these crimes." *Id.* at 233-34. The South Carolina Supreme Court concluded there was "no evidence in the record to support the PCR judge's conclusion that [Petitioner] was prejudiced by trial counsel's deficient performance . . . ." *Id.* at 234.

Such wholesale exclusion of evidence that Petitioner had no criminal record from its prejudice analysis was unquestionably contrary to the rule of *Strickland*, and the following additional decisions of the United States Supreme Court: *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Parker v. Dugger*, 498 U.S. 308 (1991); and *Tennard v. Dretke*, 542 U.S. 274 (2004). *See also McKoy v. North Carolina*, 494 U.S. 433 (1990). Thus, the South Carolina Supreme Court's elimination of this evidence from its prejudice calculus was both contrary to federal law and led to a decision that involved an unreasonable application of the prejudice standard of *Strickland*.

In *Lockett v. Ohio*, the Court noted that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character *or record* and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (second emphasis added). It is likewise beyond dispute that "[t]he sentencer, and the [state appellate court] on review, may determine the weight to be given relevant mitigation evidence. *But they may not give it no weight*

---

[48]In the end, Petitioner never "achieved" any financial gain from the murders as he never received any insurance payments. This, of course, does not discount his motive for the crimes, only the ultimate outcome.

*by excluding such evidence from their consideration.*" *Eddings v. Oklahoma*, 455 U.S. at 114-15 (emphasis added). *See also Parker v. Duggan*, 498 U.S. 308, 320 (1991) (reviewing court may not "ignore the evidence of mitigating circumstances in the record" when reweighing aggravating and mitigating circumstances or conducting harmless error analysis). More recently, in *Tennard v. Dretke*, the Court made clear that for purposes of determining whether mitigation evidence is relevant, and its consideration by a sentencer or reviewing court therefore mandatory, "the question is simply whether the evidence is of such a character that it 'might serve as a basis for a sentence less than death.'" *Tennard*, 542 U.S. at 286 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)).

As quoted above, *Strickland* and its progeny teach that a court hearing an ineffectiveness claim must consider "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. Taking the unaffected factors as a given and taking due account of the effect of the error (here, the lack of a "plain meaning" charge) on the remaining findings (the decision between the death penalty and life imprisonment), a court making the prejudice inquiry must ask if the Petitioner has met the burden of showing that the decision reached (the death penalty) would reasonably likely have been different absent the error (if the "plain meaning" charge had been given).

In evaluating the totality of the evidence, the second PCR judge accorded significant weight to Petitioner's lack of a prior criminal record in evaluating the prejudice prong of *Strickland*. Indeed, such evidence is the first of the ten statutory mitigating circumstances in South Carolina's capital sentencing statute. S.C. Code Ann. § 16-3-20(C)(b)(1) (1986) (current version of statute last amended 2002) ("Mitigating circumstances: (1) The defendant has no significant history of prior criminal conviction involving the use of violence against another person"). The conclusion of the state supreme court that Petitioner's lack of prior criminal record was "irrelevant" based on the nature of the crimes simply cannot be squared with the plain language of *Strickland*. Lack of a prior

criminal record, just like all other relevant mitigating evidence which is not inconsistent with the jury's finding of guilt, is always a mitigating factor to be weighed by the jury (and the reviewing court) in determining whether a death sentence is appropriate. *See Lockett*, 438 U.S. at 604; *Eddings*, 455 U.S. at 110; *Penry v. Lynaugh*, 492 U.S. 302, 327-28 (1989) (a sentencing jury should be able "to consider and give effect to mitigating evidence" about the defendant's "character or record or the circumstances of the offense."). Defendants who commit particularly heinous crimes do not forfeit their right to rely on their lack of prior criminal history in mitigation.

By excluding perhaps the most relevant evidence that had been before the jury from its prejudice inquiry, the state supreme court rendered itself incapable of accurately determining the prejudice prong of *Strickland*. As in *Williams v. Taylor*, "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation." *Williams v. Taylor*, 529 U.S. at 397-98.

Accordingly, this failure of the South Carolina Supreme Court to engage in a properly-conducted *Strickland* prejudice analysis led to a decision that was not only contrary to, but also involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

### 2. The state court relied on lack of affirmative evidence of juror confusion concerning parole.

The South Carolina Supreme Court concluded that there was "no evidence in the record to support the PCR judge's conclusion that [Petitioner] was prejudiced by trial counsel's deficient performance . . . ." *Williams II*, 611 S.E.2d at 234.[49] Noting that the "plain meaning" charge evolved

---

[49]It can hardly be said that there was "no evidence in the record" of mitigating factors supporting the second PCR judge's finding of prejudice. In fact, the state supreme court discussed evidence of

from the concern that capital juries were speculating about parole eligibility, the court emphasized that "there is nothing in this record to indicate that the jurors in respondent's capital trial were concerned with parole eligibility, or confused about the meaning of a life sentence." *Id.*[50]

The South Carolina Supreme Court's reliance on the lack of affirmative evidence of juror confusion concerning parole, however, runs contrary to *Strickland*, 466 U.S. at 695-96, to the United States Supreme Court's analysis in *Kelly*, and to its own cases requiring a "plain meaning" charge without regard to whether there is an inquiry from the jury. *See, e.g., State v. Atkins*, 360 S.E.2d 302, 305 (S.C. 1987) ("In all death penalty cases which proceed to trial after this opinion is published, *if requested by the defendant*, the trial judge shall charge the jury that the term 'life imprisonment' is to be understood in its ordinary and plain meaning.").

In *Kelly*, the State cited the jury's failure to ask any questions about parole, or otherwise indicate confusion on the issue of parole eligibility, as proof that no prejudicial speculation occurred. While *Simmons* and *Shafer* had cited such questions as proof of jury confusion, *Kelly* made clear that the need for jury instructions regarding parole ineligibility does not depend on whether the jury requests them. *Kelly*, 534 U.S. at 256-57. This is so because in *Kelly*, *Shafer* and *Simmons*, "it was independently significant that [d]isplacement of the longstanding practice of parole availability remains a relatively recent development [in South Carolina], and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole." *Id.* (internal quotation marks and citations omitted). Thus, while questions indicating jury confusion might have

---

mitigating factors in its opinion. *See Williams II*, 611 S.E.2d at 233.

[50]Respondent contended at oral argument that Petitioner's trial counsel sought a "parole ineligibility charge" because counsel was concerned about one juror's statement, during voir dire, that convicted murderers usually only serve a portion of the sentence imposed. Indeed, one potential juror, Mr. Godwin, had specifically indicated he thought that such a defendant would serve twenty years and then be released. Appx. at 278-79. (Godwin did not serve on Petitioner's jury, as he was excused by Petitioner during jury selection. Appx. at 836.)

constituted *additional* evidence of prejudice resulting from trial counsel's error in this case, the absence of such questions does not support the conclusion of the South Carolina Supreme Court that counsel's failure to secure a "plain meaning" instruction was not prejudicial. *See id.*, 534 U.S. at 256 ("A trial judge's duty is to give instruction sufficient to explain the law, an obligation that exists independently of any question from the jurors or any other indication of perplexity on their part."). *See also Southerland v. State*, 524 S.E.2d 833 (S.C. 1999) (no question from jury relating to parole eligibility). Therefore, in this regard, the South Carolina Supreme Court's decision was an unreasonable application of clearly established federal law.

> **3. The state court failed to consider the likely effect of the closing arguments by the prosecution and defense in conducting its prejudice analysis.**

The opinion of the South Carolina Supreme Court is also notable for its omission of any reference to the closing arguments of the prosecution or the defense on the issue of the meaning of a life sentence. During the sentencing phase, the Solicitor minimized the significance of a life sentence as follows: "[I]f you think that's [the mitigating circumstance of mental or emotional disturbance] in his favor, give him life imprisonment; pat him on the back *like any other murderer*." Appx. at 1738 (emphasis added). In addition, the Solicitor argued that imposing "only a life sentence" would indicate that Edgefield County "forgave" the defendant. *Id.* at 1746. Such comments certainly increased the risk that the jury would discount the life imprisonment sentencing alternative by considering the possibility of early release on parole.[51]

---

[51]One would reasonably suppose defense counsel would have realized that the prosecutor's argument put him on the spot, requiring him to request that the judge correct the misleading statements with an instruction that the term "life imprisonment" was to be understood in its "plain and ordinary meaning."

It is apparent from the arguments of defense counsel[52] that they believed there would be a charge to the effect that "life means the remainder of one's natural life." It is unclear why counsel held such a belief unless they thought they had requested a "plain meaning" charge or expected the trial judge to give one. But the judge did not tell the jury this, nor did he tell the jury that life imprisonment was to be understood in its plain and ordinary meaning. The judge only told the jury that if it recommended life imprisonment, that would be the sentence the court would "impose." *Id.* at 1768.

While the court indicated several times that the jury could recommend life imprisonment, the absence of a "plain meaning" charge invited juror speculation as to the meaning of life imprisonment. The above-noted comments of the defense attorneys did not suffice to cure the prejudice caused by the failure to request the "plain meaning" charge and, in fact, may have exacerbated the situation by promising that the judge would instruct on life imprisonment in a way which he did not do.[53] On the other hand, had the jury been given a "plain meaning" charge, the instruction would have been binding on the jury, as it must be assumed the jury would have followed the instruction as given. South Carolina law, like federal law, honors the presumption that jurors follow their instructions.[54] *See, e.g., Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court

---

[52]Counsel argued that "[t]he judge is gonna [sic] tell you that life in prison means life in prison. The rest of your natural life. You heard testimony the man is 41 years old. We're talkin' [sic] about the rest of his natural life[,]" Appx. at 1750, and "this man is gonna [sic] be in prison for the rest of his life[,]" *id.* at 1754. *See also supra* note 39.

[53]The United States Supreme Court has determined that argument by counsel does not suffice to cure a *Simmons* error. *See Shafer v. South Carolina*, 532 U.S. 36, 54 (2001) (noting that Shafer's parole ineligibility was "not conveyed to the jury by the court's instructions or by the arguments defense counsel was allowed to make."); *Kelly*, 534 U.S. at 257. The South Carolina Supreme Court has indicated its agreement. *See State v. Stone*, 567 S.E.2d 244, 249 (S.C. 2002) ( noting inadequacy of counsel's argument in light of *Kelly*).

[54]"[A] 'life imprisonment in its ordinary and plain meaning' charge necessarily precludes jury consideration of parole eligibility." *State v. Smith*, 381 S.E.2d at 727.

presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them."); *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (same); *State v. Grovenstein*, 517 S.E.2d 216, 219 (S.C. 1999); *State v. Pierce*, 346 S.E.2d 707 (S.C. 1986), *overruled in part on other grounds by State v. Torrence*, 406 S.E.2d 315 (S.C. 1991).

Weighing the prejudicial effect, if any, of the lack of a "plain meaning" charge required consideration of the totality of the information before the jury, including evidence, argument by counsel, and instructions. There is no indication that such a weighing took place here. Therefore, the decision of the South Carolina Supreme Court involved an unreasonable application of clearly established federal law.

### 4. The state court focused on the evidence of guilt and did not mention substantial mitigating evidence offered in the penalty phase.

The primary focus of the South Carolina Supreme Court in *Williams II* was on the evidence of guilt and the nature of the crimes. The court found fault with the second PCR judge's reliance on Petitioner's good behavior on bond and, as noted above, found the lack of a prior criminal record irrelevant to the question whether he was prejudiced by the lack of a "plain meaning" charge. There was no mention by the court of the majority of the mitigation evidence offered by Petitioner during the penalty phase of the trial.

The jury in Petitioner's case considered evidence relating to two statutory aggravating circumstances,[55] and mitigation evidence, both statutory and non-statutory. In addition to the

---

[55]The jury was directed to consider the following two statutory aggravating circumstances: "The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value" and "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct." S.C. Code Ann. §§ 16-3-20(C)(4) and (8) (1986) (current version of statute last amended 2002).

evidence noted in the decision of the South Carolina Supreme Court, the mitigation evidence

consisted of the following:

> •Petitioner was a protective child who looked out for his siblings and was not a discipline problem (Appx. at 1693, 1704);
>
> •Petitioner was taught not to show his emotions (Appx. at 1693);
>
> •Petitioner was not informed of his true parentage until he was sixteen years old, at which time he had a "hard" time accepting this information (Appx. at 1695);
>
> •Petitioner was active in sports in high school and "had lots of friends" (Appx. at 1696-97);
>
> •Petitioner became estranged from his family for a period of at least ten years after a will contest (Appx. at 1698-99),[56] but the family had reconciled after Petitioner's arrest (Appx. at 1706-08); and
>
> •Petitioner was a "quiet, withdrawn" inmate during his period of incarceration in Edgefield County Jail (Appx. at 1713).[57]

As discussed above, a *Strickland* prejudice analysis of a death penalty determination requires

that the court "consider the totality of the evidence before the . . . jury." *Strickland*, 466 U.S. at 695.

The evidence in aggravation and the evidence in mitigation must be reweighed "taking due account

of the effect of the errors . . . ." *Id*. at 696. There is no indication the South Carolina Supreme Court

conducted such a reweighing of the majority of the evidence in the penalty phase, or that it

---

[56]The will of Petitioner's maternal grandmother left a motel to Petitioner. Petitioner's mother unsuccessfully contested the will, and Petitioner and the members of his family did not thereafter have any interaction for approximately ten years. Appx. at 1698-99. Petitioner's mother testified that she visited Petitioner in the hospital in 1987 when he suffered a serious, work-related accident, but that she did not see Petitioner, Linda or Shaun after that. *Id*. at 1699.

[57]The testimony of Marion Turner, jailor for Edgefield County, South Carolina established that Petitioner was incarcerated from June 19, 1992 through October 30, 1992. Appx. at 1712. Thereafter, Petitioner was released on a secured bond until the jury was seated in his criminal trial in November, 1993. *See id*. at 1718. On cross-examination, Turner's testimony established that Petitioner occasionally asked for a telephone call "to check on his dog," *id*. at 1715; that he refused recreation, *id*. at 1715; that Petitioner "didn't use the shower very often" even though he had access to one, *id*. at 1716; and that Petitioner was "unemotional," *id*. at 1716.

considered the evidence in mitigation (other than discounting the good behavior on bond and finding the lack of prior record irrelevant). *Cf. Woodford v. Viscotti*, 537 U.S. 19, 25 (2002) (reviewing evidence considered by state supreme court). In fact, the court concluded that there was "no evidence in the record" to support the second PCR judge's conclusion of prejudice. *Williams II*, 611 S.E.2d at 234. This statement and the absence of any reference to the majority of the penalty phase evidence of mitigation demonstrates that the court's prejudice analysis involved an unreasonable application of *Strickland*.

### D.  Conclusion as to § 2254(d)(1)

Based upon the analysis above, this court must conclude that the adjudication of this ground by the South Carolina Supreme Court was both contrary to, and involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Moreover, the unreasonable application was objectively unreasonable because the state court specifically excluded from its prejudice analysis evidence required to be considered by *Strickland*. This was an objectively unreasonable application of United States Supreme Court precedent. *See, e.g., Wiggins v. Smith*, 539 U.S. at 529-30; *Viscotti*, 537 at 25 ("[I]t is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner."); *Williams v. Taylor*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."); *Rompilla v. Beard*, 545 U.S. 374, ___, 125 S. Ct. 2456, 2462 (2005).[58] Petitioner has met the burden of 28 U.S.C. § 2254(d)(1).

---

[58]The Fourth Circuit has stated that, in assessing the reasonableness of the state court's application of federal law, "federal courts are to review the result that the state court reached, not whether its decision was well-reasoned." *Campbell v. Polk*, ___ F.3d ___, 2006 WL 1237256 at *3 (4th Cir. May 10, 2006) (quoting *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003)). While it is certainly correct that a well-reasoned decision by the state court is not required, a result reached by

## E. Independent Analysis – § 2254(a)

If the state court adjudication is contrary to, or an unreasonable application of, clearly established Supreme Court precedent, then § 2254(d) is no bar to relief, although this court is not *required* to grant habeas relief. *See Williams v. Taylor*, 529 U.S. at 412 (a federal court "may" issue the writ upon determining that the standards set forth in § 2254(d)(1) are satisfied); *Rose v. Lee*, 252 F.3d at 691 (noting that "the proper interpretation of the rule of § 2254(d)(1) in habeas review is that it establishes a threshold by which we determine whether we are authorized to issue a writ, but it does not compel the issuance of a writ once the standard set forth therein has been satisfied."). Rather, this court then reviews the merits of Petitioner's claim under the pre-AEDPA *de novo* standard of review, no longer constrained by the deference required under § 2254(d), *see Moody v. Polk*, 408 F.3d 141, 147 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1060 (Jan. 9, 2006), to determine whether in its independent judgment, Petitioner is being held in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

At the time of Petitioner's trial and direct appeal, the United States and South Carolina Supreme Courts had acknowledged that, absent appropriate jury instructions, juries were unlikely to appreciate recent legislative restrictions on early parole availability from "life" sentences. *See, e.g., Simmons*, 512 U.S. at 169-70; *State v. Norris*, 328 S.E.2d at 344; *State v. Smith*, 381 S.E.2d 728 (Chandler, J., concurring and dissenting). Prior to 1977, the minimum period before parole eligibility for life-term inmates in South Carolina was only ten years. In 1977, the South Carolina Legislature doubled this minimum period before parole eligibility to twenty years. 1977 S.C. Acts 407. In 1986, the South Carolina General Assembly again increased the minimum period before

---

misapplication of the *Strickland* standard which is not only contrary to and an unreasonable application of federal law, but also objectively unreasonable, is, by definition, not entitled to deference under § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. at 409.

parole eligibility in a death-eligible murder case (where a jury found a statutory aggravating circumstance, but chose to impose life imprisonment) to thirty years. 1986 S.C. Acts 2983. As Justice O'Connor observed in *Simmons*, issued a few months after Petitioner's trial, "[t]he rejection of parole by many States (and the Federal Government) is a recent development that displaces the longstanding practice of parole availability . . . and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole." *Simmons*, 512 U.S. at 177-78 (O'Conner, J., concurring). The *Simmons* plurality opinion described a statewide survey of potential jurors in South Carolina, conducted in June 1991, just over two (2) years before Petitioner's trial, that revealed significant underestimation of the effect of a life sentence in a capital murder case:

> [O]nly 7.1 percent of all jury-eligible adults [in South Carolina] who were questioned firmly believed that an inmate sentenced to life imprisonment in South Carolina actually would be required to spend the rest of his life in prison. Almost half of those surveyed believed that a convicted murderer might be paroled within 20 years; nearly three-quarters thought that release certainly would occur in less than 30 years. More than 75 percent of those surveyed indicated that if they were called upon to make a capital sentencing decision as jurors, the amount of time the convicted murderer actually would have to spend in prison would be an 'extremely important' or a 'very important' factor in choosing between life and death.

*Id.* at 159 (citing state-wide public opinion survey conducted by the University of South Carolina's Institute of Public Affairs in 1991). Based on this, it is reasonable to conclude, as have the South Carolina and United States Supreme Courts in other cases, that the members of Petitioner's jury may well not have appreciated the fact that state law required Petitioner to serve at least thirty years before being considered for parole (if they found a statutory aggravating factor but recommended life imprisonment).

South Carolina had addressed this problem of jurors' speculation regarding parole eligibility by requiring judges, on request, to give a "plain meaning" charge. This charge had remained a permanent fixture of South Carolina's capital sentencing procedure, except to the extent that

subsequent statutory changes and the federal Constitution required even more protective instructions. *See* 2002 S.C. Act No. 2718 (mandating "truth-in-sentencing" instructions regarding parole ineligibility upon request); *Simmons*, 512 U.S. at 171; *State v. Shafer*, 531 S.E.2d 524, 531 (S.C. 1989), *overruled on other grounds by Shafer v. South Carolina*, 532 U.S. 36 (2001); *State v. Kelly*, 540 S.E.2d 851, 856 n.6 (S.C. 2001), *overruled on other grounds by Kelly v. South Carolina*, 534 U.S. 246 (2002). In fact, the South Carolina Supreme Court has found the right so clearly established that it ordered a new sentencing hearing after finding appellate counsel was ineffective for failing to raise a trial court's denial of a requested "plain meaning" charge. *State v. Southerland*, 524 S.E.2d 833 (S.C. 1999).

As noted above, the sole argument against prejudice raised by Respondent on appeal in the state court was based on Justice O'Conner's comment on the inadequacy of the "plain meaning" charge in *Simmons*. In effect, Respondent urged that *Simmons* had invalidated the South Carolina Supreme Court's many decisions recognizing the value of, and requirement for, a "plain meaning" charge to protect capital defendants from juries' presumed prejudicial speculation about early release on parole from a life sentence. *See, e.g., State v. Norris*, 328 S.E.2d 339 (S.C. 1985); *State v. Atkins*, 360 S.E.2d 302 (S.C. 1987); *State v. Torrence*, 406 S.E.2d 315 (S.C. 1991); *State v. Davis*, 411 S.E.2d 220 (S.C. 1991); *State v. Ard*, 505 S.E.2d 328 (S.C. 1999). Yet the South Carolina Supreme Court implicitly rejected Respondent's no prejudice argument (in *Williams II*) by resting its reversal of the second PCR court on an argument never raised by Respondent – that the evidence warranting the death penalty was so strong, and the mitigating evidence so insubstantial, that trial counsel's failure to request the charge was not reasonably likely to have affected the outcome of the sentencing hearing.

In *Simmons*, Justice O'Conner observed that a "plain meaning" charge "does nothing to

dispel the misunderstanding reasonable jurors may have about the way in which a particular state defines 'life imprisonment.'" *Simmons*, 512 U.S. at 170. As a matter of state law, however, the "plain meaning" charge has been found adequate, before and after *Simmons*, to address juror speculation about parole eligibility in cases such as Petitioner's.[59] The "plain meaning" charge, in fact, was the only life imprisonment definition available to Petitioner at the time of his sentencing hearing. Although it is certainly correct that a clearer instruction than the "plain meaning" instruction could have been fashioned,[60] including one such as Petitioner's counsel proposed, at the time of Petitioner's trial, the South Carolina Supreme Court had prohibited such an instruction.

Here, where the ineffectiveness is the failure to request a jury charge which was required to be given if requested, this court must consider the totality of the evidence before the jury and determine whether there is a reasonable probability that, if the "plain meaning" charge had been given it might well have influenced at least one juror to choose life imprisonment. *See Wiggins*, 539 U.S. at 537-38. *Strickland* defines a reasonable probability, in this context, as a probability sufficient to undermine confidence in the outcome, as "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693.[61]

---

[59]*See State v. Smith*, 381 S.E.2d at 727.

[60]Counsel for both Petitioner and Respondent indicated at oral argument of this case that Petitioner will be entitled, if this court were to grant the writ and order a new sentencing trial, to a thirty-year-without-parole charge, the very charge Petitioner's counsel sought in his original trial. *See* S.C. Code Ann. § 16-3-20(A) (2002). *See also State v. Shafer*, 573 S.E.2d 796, 201 (S.C. 2002) ("The [South Carolina] Legislature amended S.C.Code Ann. § 16-3-20 (Supp.2001), effective May 28, 2002, to revise the definition of life imprisonment and provide that, when requested by the state or the defendant, the judge must charge the jury in his instructions that life imprisonment means until the death of the defendant without the possibility of parole, and in cases where the defendant is eligible for parole, the judge must charge the applicable parole eligibility statute.").

[61]In *Boyde v. California*, 494 U.S. 370 (1990), the Court applied a similar standard in a case which dealt with an allegedly defective penalty phase jury instruction. The Court first defined the general standard as "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*,

Because the result of the error was an omission in the jury charge, it is also necessary for the court to examine the charge actually given and the closing arguments of the attorneys on issues relating to the meaning of the term "life imprisonment." This court has done so. This reweighing of the evidence, the missing instruction, and the arguments by counsel, coupled with studies establishing juror speculation about parole and the fact that a "plain meaning" charge was the only definition of life imprisonment available to Petitioner at the time of his trial, leads this court to conclude in its independent judgment that counsel's unwitting forfeiture of Petitioner's state-created right to a "plain meaning" instruction was reasonably likely to have affected the outcome of his capital sentencing hearing.

Because Petitioner's death sentences are subject to this reasonable likelihood of constitutional error, and because he may die as a consequence, the effect of counsel's failure is surely prejudicial under *Strickland*. Thus, this court agrees with the second PCR judge that in this case, tried in South Carolina in 1993, where the evidence of guilt was largely circumstantial, where the defendant had no prior criminal record, where the defendant's prior history contained a number of mitigating factors, and where the prosecution argued a life sentence would be a pat on the back, a failure to request a "plain meaning" charge satisfies the prejudice prong of *Strickland*.

Petitioner has established both prongs of the *Strickland* test relating to the impairment of his right to counsel under the Sixth Amendment to the United States Constitution on this ground. Therefore, Petitioner's death sentences are hereby vacated without prejudice to the right of the State of South Carolina to sentence Petitioner to life imprisonment, or to conduct further proceedings as

---

494 U.S. at 380. Noting that a "reasonable likelihood" is more than a mere possibility that the jury mistook the law, the Court concluded that a defendant "need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction." *Id.* The same standard was followed by the Court in considering penalty phase jury instructions in *Penry v. Johnson*, 532 U.S. 782 (2001), and *Brown v. Payton*, 544 U.S. 133 (2005).

49

may be appropriate under state law (including a new sentencing hearing), if initiated with 270 days of the entry date of this order.

### IV. Eighth Amendment Violation – Heightened Reliability of Evidence

Petitioner's last ground for relief argues the circumstantial evidence used to convict him "left substantial room to doubt" whether he was the perpetrator of the crime, and whether the crime occurred in South Carolina.  Pet. at 30-31, filed July 13, 2005.[62]

Petitioner contends the inconclusive circumstantial evidence does not support the imposition of a death sentence, and this therefore violates Petitioner's Eighth Amendment rights.  Petitioner presents no argument in the Petition or his Reply brief as to how the South Carolina Supreme Court's ruling on this issue, presented in Petitioner's direct appeal, ran aground on the shoals of § 2254(d). Respondent's Return is also of little aid on this ground.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  The provision is applicable to the states through the Fourteenth Amendment.  *Furman v. Georgia*, 408 U.S. 238, 239, (1972) (per curiam). The Eighth Amendment's guarantees flow from the "'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.'" *Atkins v. Virginia*, 536 U.S. 304, 311 (2002) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

The Eighth Amendment requires that the categories of conduct which render a defendant eligible for the death penalty must be sufficiently narrow to result in a significantly small subclass of individuals; that is, those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution." *Atkins*, 536 U.S. at

---

[62]This court's decision to grant Petitioner a new sentencing hearing on Ground III renders Ground IV moot at this point.  However, to facilitate appellate review, the court addresses Ground IV in the alternative.

319. Therefore, whether or not a defendant is eligible for the death penalty is not a matter of juror discretion. "Eligibility factors almost of necessity require an answer to a question with a factual nexus to the crime or the defendant so as to 'make rationally reviewable the process for imposing a sentence of death.'" *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (quoting *Arave v. Creech*, 507 U.S. 463, 471 (1993)). The Eighth Amendment also requires that the actual selection of the death penalty as punishment for an individual defendant meet certain criteria, such as having proper consideration of aggravating and mitigating circumstances, *see Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980) (plurality opinion), and that the actual selection of the death penalty for a particular defendant be based upon an individualized determination directed to the individual and the circumstances of the crime. *See, e.g., Lockett v. Ohio*, 438 U.S. at 601; *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Therefore, as noted by the Supreme Court,

> States must limit and channel the discretion of judges and juries to ensure that death sentences are not meted out 'wantonly' or 'freakishly.' On the other [hand], . . . States must confer on the sentencer sufficient discretion to take account of the 'character and record of the individual offender and the circumstances of the particular offense' to ensure that 'death is the appropriate punishment in a specific case.'

*Graham v. Collins*, 506 U.S. 461, 468 (1993) (internal citation omitted).

Petitioner does not argue that South Carolina's statutory aggravating circumstances are overly broad or otherwise constitutionally insufficient. Nor does Petitioner argue the jury's consideration of the statutory aggravating circumstances and mitigating circumstances, both statutory and non-statutory, was somehow skewed. *See Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("In any capital case a defendant has wide latitude to raise as a mitigating factor 'any aspect of [his or her] character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.') (quoting *Lockett*, 438 U.S. at 604). Petitioner simply argues that because the circumstantial evidence was "equivocal," the death sentence violates the Eighth Amendment.

For the reasons noted above in the discussion of Petitioner's first ground for relief, the court finds his fourth ground to be without merit. The decision of the South Carolina Supreme Court on the sufficiency of the evidence ground was neither contrary to, nor an unreasonable application of, clearly established federal law under § 2254(d)(1). Therefore, Respondent is entitled to summary judgment on this ground and it is dismissed with prejudice.

## CONCLUSION

For the reasons stated above, Respondent's motion for summary judgment is granted as to Grounds I, II, and IV, and denied as to Ground III. As to Ground III, the death sentences imposed upon Petitioner are **VACATED**, without prejudice to the right of the State of South Carolina to sentence Petitioner to life imprisonment, or to conduct such further proceedings as may be appropriate under state law (including a new sentencing hearing), if initiated within 270 days of the entry date of this order.

**THE WRIT SHALL ISSUE.**

**IT IS SO ORDERED**.

CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
May 31, 2006

O:\Civil Orders\Death Penalty Habeas Corpus\05-1648 Williams v. SC e final order.wpd